SARAH JANE MONROE AND ANOTHER v. ALBERT W. SEARCY AND OTHERS.

The validity of verbal sales of land in this country, before the passage of the Act of 1840 concerning conveyances, was recognized by early decisions, and the rule will not be disturbed. That such is the general rule of Spanish law is unquestionable. The only change in the law was with a view to the certain collection of the revenue; and this, we have shown, has been allowed no force in our decisions, and has certainly no application to the sale in question, (which was from several heirs to one to effect partition.)

A verbal sale of land by the wife, with the consent of the husband, was valid under the laws in force prior to 1840.

Appeal from Lavaca. Tried below before the Hon. Fielding Jones.

William and Isabella Ponton, husband and wife, came to Texas, and as colonists obtained a headright league of land in the year 1832, from Empressario Stephen F. Austin. In the year 1834, the said William Ponton was killed in Texas, by the Indians, and left a widow, Isabella aforesaid, and four children, to wit: Andrew Ponton, Joel Ponton, Sarah Ann Ponton, and Mary Jane Ponton. One of those children, to wit: Mary Jane Ponton, sometime previous to the year 1831, married one James B. Patrick, by whom she had two children, a son and a daughter, Sarah Jane Patrick, (since marriage Sarah Jane Monroe,) and John N. Patrick, plaintiffs in the present suit. The said Mary Jane Patrick died in the year 1838, leaving the aforesaid Sarah Jane and John N. Patrick infant heirs. There had not at that time, nor has there ever been any administration on any of the estate of William Ponton aforesaid.

In March, A. D. 1856, Sarah Jane Monroe, (with her husband Hugh W.) and John N. Patrick filed their petition in the District Court of Lavacca county, as heirs of the aforesaid William Ponton, deceased, claiming as such heirs one-quarter of said league of land, and that the same be partitioned.

By consent the cause was submitted to the Court without a jury. The evidence on the only real question of fact in the case is fully stated in the Opinion.

The witness Joel Ponton testified that the father, William Ponton, had contracted with Andrew Ponton, brother of witness, to clear out and get title to the league of land mentioned in the petition; that he agreed to give Andrew one-half of the league for doing so; that before Andrew had got his title from his father, the latter died; that the heirs all being willing to carry out said agreement, witness, James B. Patrick and Andrew Ponton, came down from Gonzales county where they then lived, to look at the said league, to see if the same or the half they were interested in was susceptible of division; that they all were of opinion that it was not; that Andrew proposed to sell out his interest or buy the others; that they returned to Gonzales where Mrs. Patrick was, (this was in the year 1834 or 1835,) and informed Mrs. Patrick, who agreed, &c.

The widow of William Ponton, after joining in the conveyance of three-fourths of the league to Andrew Ponton, had made other conveyances to several of defendants, which would cover any balance of interest she might be supposed, under any circumstances, to have retained.

*Hutchinson & Megginson*, for appellants.   I. The judgment of the Court was manifestly erroneous; there being no sufficient evidence to prove that Mrs. Patrick had ever sold her interest in said league of land, or even agreed so to do.

But supposing she had made such a verbal agreement to sell, as the one spoken of by Joel Ponton, that fact must be testified to by at least two. credible witnesses, according to civil law in force at the time the alleged sale was made.   That number at least, was indispensable. (White's Recop. Vol. 1st, page 295, marg'l 280; Pothier on Obligations, Vol. 1st, page 551; Partidas, Vol. 1st, L. 32, Tit. 16, P. 3.)

This one defect of itself would be fatal to the defendants' cause.   This case is governed by the civil law, which requires five witnesses to the fact of an extra judicial written sale, where there is an evidence of itself that cannot be mistaken; and hence, how much stronger the reason for the necessity of more than one to prove a mere verbal agreement.   It is much more probable, that one individual should prove false, or be mistaken, than that a written document and three persons should misunderstand, or misrepresent.

II. The Court erred further, for the reason, that there was not a particle of proof of any price to be paid, or of any consideration whatever that was to pass between these contracting parties, at the time of the alleged sale.

III. To have given this transaction some semblance of a sale, it would also have been necessary for them to prove that possession accompanied the alleged sale. (Briscoe v. Bronaugh, 1 Tex. R.)

But on the contrary they have shown by their single-handed witness, that possession did not so accompany, but that at least three years elapsed between the one and the other.

There is something said by this Joel Ponton concerning them all leaving and going east on account of the Mexicans coming into Gonzales; but that did not prevent them while east from having the agreement to sell reduced to writing, and made bind-

ing; why they did not, must be satisfactorily accounted for, as it certainly gave them a good opportunity to do so.

IV. There is no evidence that James B. Patrick, the husband, gave his sanction to this alleged sale, during the lifetime of Mrs. Patrick; and they have failed to prove, that it was advantageous to her husband and not injurious to her family. There is no criterion whether or not it was advantageous, or injurious, for there is no price or consideration mentioned by which to judge.

V. As to the contract of the grantee Wm. Ponton, with his son Andrew Ponton, to give one-half of said league to said Andrew to clear out the other half, that contract was void by law, and could not be enforced. If it was ever made, it was made between the years 1832 and 1834. (Clay v. Cook, 16 Tex. R. 70.)

*Smith, Stockdale* and *Tevis*, for appellees. The evidence clearly shows a verbal sale by Mrs. Patrick to Andrew Ponton, some time in the year 1834 or 1835; that she was prevented from making a deed by the invasion of the Mexicans; that she had received pay for it, and possession was given, which, under the laws in force at that time was valid. (See Briscoe v. Bronaugh, 1 Tex. R.; Solomon v. Scott, Dallam.) The facts further show a full acquiescence in the sale by all parties; that Andrew Ponton had taken the possession of the land before the death of Mrs. Patrick, and he and those claiming under him had held possession for twenty years and upwards.

HEMPHILL, CH. J. The great question in this cause is whether Mrs. Patrick, the mother of Sarah Jane Munroe and John N. Patrick, the plaintiffs, and through whom they claim, conveyed away, in her lifetime, her interest or share in the land in controversy.

That she did make such sale verbally, is proven by one witness; but it is urged by the appellants, that by the Spanish law in force at the time, viz: in 1834 or 1835, the fact of such sale should be proven by at least two credible witnesses; citing 1 White's Recop. p. 280. There is no doubt that in Spanish jurisprudence, when a fact is to be established by witnesses, there must be two to produce full proof and faith. (1 White, p. 280; Escriche, Dicc. *vebo* TESTIGO.) But the rules of evidence under the laws of Spain are no longer in force. Facts, on judicial trials, are to be proven under the rules of evidence as known to

the Common Law. Where a certain number of witnesses are required by our former laws for the form and solemnity of an act, such act, as a general rule, without the specified number of witnesses, could not be sustained. But the ancient rules as to the number of witnesses, their ages and other qualities and circumstances, required in the proof of ordinary facts, have fallen with the old system. Under the Common Law, the testimony of one witness is sufficient proof of a fact. If, under the ordinary rules of evidence in our ancient jurisprudence, two witnesses could have established the fact of a verbal sale of property, one witness would suffice for that purpose under the rules of evidence as now recognized.

No doubt the evidence of two witnesses would be more satisfactory; and if verbal sales of lands were permitted under our present laws, it might be well considered by the Courts whether, for the security of rights, the testimony of more than one witness to a transfer should not be required. But such rule has not been hitherto enforced; and to establish it now, with reference to ancient transactions, might work a serious detriment to a large class of rights dependent on such sales.

The testimony of the witness Joel Ponton is quite clear, that he, with the other heirs of his father, concurred in selling their shares of this land to their brother, Andrew Ponton, one of the heirs; that their sister, Mrs. Patrick, then the wife of James B. Patrick, the mother of the plaintiffs, agreed with the rest to sell to Andrew; that Andrew paid the witness for his share; is positive that he paid Mrs. Patrick a part, and he believes the whole, of her portion; that Mrs. Patrick acquiesced in the sale, and was perfectly satisfied with it, but before a deed was made or possession taken, all parties, on the Mexican invasion, moved to the East; that Andrew Ponton, with other members of the family, returned in the fall or winter of 1837 or the early part of 1838, and shortly afterwards went upon and improved the land he had purchased from the heirs. This possession was taken before the death of Mrs. Patrick, under the said agreement of sale. After the death of Mrs. Patrick, which occurred in 1838, in order to carry out the agreement of sale, and without any new agreement, the widow of Wm. Ponton, the grantee of the land, being the mother of the heirs, and the surviving children joined with James B. Patrick, the husband of Mary Jane Patrick, then deceased, in executing, on the 16th of April, 1839, a conveyance to the co-heir Andrew Ponton for three-fourths of the land.

The evidence establishes the important facts that Mrs. Patrick did sell, in her lifetime, her interest in the land; that her vendee took possession in a reasonable time after the sale; and that he and those claiming under him have been in possession ever since.

That the husband, James B. Patrick, consented to the sale by his wife is most manifest from the evidence. The tenor of the whole of the transactions evinces that the husbands of the female heirs had a sufficient regard for their rights with reference to the property. Mr. Patrick went with the other heirs to examine the land, and agreed with them that it was not susceptible of an equitable division, and united with the others in reporting this fact to his wife. His joinder in the conveyance made after the death of his wife would have no effect upon her rights, but it is a circumstance among others, from which may be inferred his assent to the previous transaction.

We have heretofore decided, that under the laws of Spain a verbal sale of lands, accompanied with possession, was valid. (Scott and Solomon v. Maynard, Dallam.) By reference to Spanish commentators and jurists it may often appear as a rule, that the sales of immovable property must be made by public instrument before a Notary. The reason of this rule is explained in Gonzales et al v. Sanches et al. 4 Martin, N. S. It is shown to have been derived from a law of the Nueva Recopilacion, 9, 17, 10; and that the law was designed and expressly intended as a fiscal measure, and enacted to facilitate the collection of the *alcabala* duty; and as the province of Louisiana was exempt from that duty, the law was never considered as extending to it. This law is the Law 14th, Lib. 10, Tit. 12, of the Novissima Recopilacion, and it is well said by the Court in Louisiana to have been intended merely to insure the collection of the duty of Alcabala. This duty was an *ad valorem* tax, levied for the use of the Government, on the price of property at all sales or exchanges. The preamble (as it may be termed) shows the intention to guard against injury to the treasury, from secret sales; and that therefore sales and exchanges of real property should pass before a Notary. There are several provisions of the law, and of the royal circular of the 7th June, 1795, issued in aid of the law; but they all manifest the single purpose of securing the tax for the Government.

It is questionable whether, in Spain, the Alcabala would have been levied on the transaction or sale in 1835. Such tax is not imposed in cases of division of an estate, although money or

23

other property may pass between the heirs to equalize their shares of the inheritance. (L. 20, Tit. 12, Lib. 10, Nov. Rec.; Escriche, *verbo* ALCABALA.) But however that may be, it is believed that the Alcabala was not levied on sales or exchanges of property in Texas. Certainly it never was imposed or enforced on sales or exchanges of property among the colonists.

By the 32d Art. of the Colonization Law of the State of Coahuila of the 24th March, 1825, the colonists, for the first ten years after a new settlement was founded, were free from all taxes, of every denomination. The contract for the settlement, under which the land was granted, was not made until the 4th of June, 1825. Some time must have elapsed before the foundation of the settlement, and the ten years would not expire until after the commencement of the Revolution. But we do not intend to intimate that a verbal sale under the Spanish law, as it existed in Texas, could be invalidated from considerations with reference to the Alcabala duty. The validity of such sales was recognized by early decisions, and the rule will not be disturbed. That such is the general rule of Spanish law is unquestionable. In Partidas, 5th Tit. L. 6, it is said sales may be with or without writing. The rule is expressed in like terms by commentators. (*Vide* Febrero Reformado, Madrid Edition of 1852, vol. 2d, p. 404; Sala, Lib. 2, Tit. 10.)

The only change in the law was with a view to the certain collection of the revenue, and this we have shown has been allowed no force under our decisions, and has certainly no application to the sale in question.

Isabella Ponton, the widow of Wm. Ponton, was entitled to the half of the league in her community right; or if half be conveyed to Andrew for clearing out the title, she was entitled to the one-fourth. This portion has in effect been claimed and sold by her. At all events, her claim, and that of Andrew under the sale, include the whole of the land, and leave nothing for distribution among the plaintiffs.

Judgment affirmed.